UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THERESA BELLER,

                   **Plaintiff,**

      *- against -*

CAROLYN W. COLVIN,[1]
**Acting Commissioner of Social Security,**

                   **Defendant.**

**12 Civ. 5112 (VB)(PED)**

**REPORT AND
RECOMMENDATION**

**TO:**   **THE HONORABLE VINCENT L. BRICCETTI,
UNITED STATES DISTRICT JUDGE**

## I. INTRODUCTION

Plaintiff Theresa Beller brings this action pursuant to 42 U.S.C. § 405(g) challenging the

decision of the Commissioner of Social Security (the "Commissioner") denying her application

for benefits on the ground that she is not disabled within the meaning of the Social Security Act

(the "Act"), 42 U.S.C. §§ 423 *et seq.*

Presently before this Court, pursuant to an order of reference, Dkt. No. 2, are the parties'

respective motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of

Civil Procedure. Dkt. Nos. 10 (Plaintiff's Notice of Mot.), 11 (Plaintiff's Memorandum of Law

("Pl.'s Mem.")), 12 (Defendant's Notice of Mot.), 13 (Defendant's Memorandum of Law

("Def.'s Mem."). For the reasons set forth below, I respectfully recommend that Defendant's

motion be **DENIED** and that Plaintiff's motion be **GRANTED** to the extent that the case be

**REMANDED** for further administrative proceedings.

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Acting Commissioner
Colvin is substituted for her predecessor, Michael J. Astrue.

## II. BACKGROUND

### A.   Plaintiff's Application for Social Security Benefits

Plaintiff applied for Social Security disability benefits on or about June 19, 2009.  R. 119–20.[2]  In her application, Plaintiff, who was born in March 1958 and was fifty-one years old at the time of her application, claimed that she had been disabled and unable to work since January 1, 2009 due to residual effects of bilateral rotator cuff surgeries; side effects of surgical, radiological, and hormonal treatments for breast cancer; and pain in her back and leg that apparently was caused by a pinched nerve.[3]  R. 135–71.  Plaintiff claimed that these conditions caused her to have trouble walking, sleeping, bending, climbing stairs, and sitting for long periods of time and to have limited use of her arms.  R. 135–71.  Plaintiff's application indicated that she had worked as a veterinary assistant from 1986 until 2003.  R. 137.  Beginning in 2004, Plaintiff worked part-time as a real estate agent.  R. 137.  Plaintiff also indicated in her application that she had completed school through the tenth grade.  R. 143.   In terms of her current daily activities, Plaintiff noted that she was able to take care of her own personal hygiene; prepare simple meals for herself; care for her five pets; perform basic cleaning and shopping tasks; drive herself; and work in her real estate office two days per week.  R. 155–60.  Plaintiff also reported that she spent five days per week at radiation therapy and also attended physical therapy sessions twice per week.  R. 160.

---

[2] Citations to "R. __" refer to the administrative record that was filed with the Commissioner's answer.  Dkt. No. 7.

[3] Plaintiff also noted in her application that she was "getting depressed."  R. 136.

2

**B.**     **Medical Evidence**

1.     *Treatment History*

a.     Breast Cancer

On November 17, 2008, Plaintiff visited her primary care physician, Dr. Eunice Hoolihan

of Hudson River Healthcare / Community Health.  R. 297–98, 353–54 (duplicate).  Dr. Hoolihan

confirmed a mass in Plaintiff's left breast, received results of a "suspicious mammogram," and

referred Plaintiff for a "[f]ine needle biopsy."  R. 298.  Plaintiff returned to Dr. Hoolihan on

December 16, 2008 at which time Dr. Hoolihan referred Plaintiff for surgery and oncology.[4]  R.

299–300, 350–51 (duplicate).

On December 23, 2008, Plaintiff underwent a biopsy that indicated invasive ductal

carcinoma *in situ* in the left breast.  R. 211–12, 267–84.  On the same day, Dr. Theodora Budnik

performed a lumpectomy at St. Francis Hospital.  R. 213–17.  Plaintiff visited Dr. Budnik on

January 8, 2009 for a post-operative check.  R. 267–68.  Plaintiff followed up with Dr. Budnik

again on January 14, 2009, at which time she reported "minimal residual discomfort" from the

surgery.  R. 265–66.  Dr. Budnik referred Plaintiff to Dr. Ramanohana Kancherla, a medical

oncologist at Hudson Valley Hematology-Oncology.  R. 266.

On February 2, 2009, Plaintiff saw Dr. Kancherla, who prescribed Tamoxifen.  R.

311–12.  On February 16, 2009, Plaintiff followed up with Dr. Hoolihan and reported that she

was taking Tamoxifen.  R. 301–02, 348–49 (duplicate).  Plaintiff returned to Dr. Kancherla on

March 18, 2009, was advised to continue Tamoxifen, and was referred to St. Francis Hospital's

---

[4] The records for the November 17 and December 16 appointments reflect that Dr. Hoolihan also screened Plaintiff for depression and concluded that Plaintiff was experiencing "[m]ild" or "[m]inimal" depression.  R. 297, 299.

Professional Radiation Oncology Services ("PROS"). R. 313.

On April 3, 2009, Plaintiff consulted with Dr. Anne Chiang at New Milford Hospital-Columbia Presbyterian Regional Cancer Center regarding radiation treatment. R. 224–35. Plaintiff reported to Dr. Chiang regarding apparent side effects from the Tamoxifen and also noted that she had "chronic swelling to her left ankle, after 5 fractures." R. 232. Dr. Chiang noted that Plaintiff appeared to be in "no acute distress sitting upright in the chair," that she was "able to get up on the examination table without difficulties," that her neck was "supple," and that she had "no spinal tenderness on palpitation." R. 232–33. Dr. Chiang noted that Plaintiff was to follow up with her in three months. R. 233. Plaintiff, however, did not return to New Milford Hospital for radiation treatment after she learned that she could not use her New York state Medicaid benefits at this Connecticut hospital. R. 244.

Plaintiff followed up with Dr. Budnik on July 7, 2009. R. 258, 260. Dr. Budnik's report notes that Plaintiff had not yet begun radiation treatment because "she did not realize that it was so important" and had been in the process of arranging treatment with New Milford Hospital when she learned that she could not use her New York state Medicaid benefits there. R. 258. Dr. Budnik noted that Plaintiff continued to take Tamoxifen and that a June 9, 2009 MRI showed only "post surgical changes in the left breast and axilla." R. 258, 261–62. Dr. Budnik noted that "breast inspection and palpation in two positions are unremarkable except for a well-healed transverse incision in the lateral left breast, another incision in the left axilla, and a stiff left shoulder." R. 260. Dr. Budnik also noted that Plaintiff's extremities were "[n]ormal with no calf tenderness or swelling." R. 260. Dr. Budnik "strongly advised" Plaintiff to pursue radiation

4

treatment and to continue with Tamoxifen.[5]  R. 260.

On July 7, 2009, Plaintiff consulted with Dr. Kathy Lo and Christa Mitchell, RPA-C, at PROS.[6]  R. 244–46.  Plaintiff reported during the consultation that she had not pursued radiation earlier "because she ha[d] been having back pain and myalgias."[7]  R. 244.  Plaintiff also reported various side effects from Tamoxifen, including hot flashes and hair loss.  R. 245.  Plaintiff noted that she had "various myalgias" and a history of "fracture," and the doctor noted that Plaintiff's breasts had no palpable abnormalities, that her extremities had "[n]o cyanosis, clubbing, or edema," and that Plaintiff's "gait" and "stance" were "normal."  R. 245–46.

Plaintiff began radiation treatment on July 14, 2009.  R. 247.  Following this initial session, Plaintiff completed five additional radiation treatment sessions on July 20, 2009, July 31, 2009, August 4, 2009, August 13, 2009, and August 18, 2009.  R. 248.  During this course of treatment, Plaintiff complained of mild breast tenderness, herniated discs in her back, shoulder pain, and erythema and dry desquamation of her breast.  R. 248.  On August 12, 2009, Plaintiff again followed up with Dr. Kancherla.  R. 314, 444 (duplicate).

Plaintiff returned for a one-year follow-up with Dr. Budnik on December 3, 2009, at which time Dr. Budnik noted that Plaintiff had made "[e]xcellent progress one year following

---

[5] At the request of the Social Security Administration ("SSA"), on August 3, 2009, Dr. Budnik completed a medical questionnaire but declined to include any opinion regarding Plaintiff's potential physical limitations other than to note that she had no opinion "from a surgical standpoint" regarding Plaintiff's ability to engage in "work-related physical activities." R. 250–57.

[6] The record indicates that SSA sent PROS a medical questionnaire that included questions regarding Plaintiff's potential physical limitations, though PROS apparently returned this form to SSA without responding to those questions. R. 238–41.

[7] This record also notes that Plaintiff reported that she would be seeing an orthopedics doctor on July 8, 2009. R. 244.

diagnosis and treatment of Stage I left breast cancer treated with lumpectomy, . . . radiation therapy . . . , and tamoxifen." R. 436–40.

On January 18, 2010, Plaintiff followed up at Hudson Valley Hematology-Oncology. R. 443. Plaintiff reported that her hot flashes and night sweats had stopped and that she had been receiving treatment for back and leg pain. R. 443. Plaintiff also reported that she was "tolerating Tamoxifen well" and was advised to "continue Tamoxifen." R. 443.

On March 18, 2011,[8] Plaintiff returned to Hudson Valley Hematology-Oncology and also apparently underwent related diagnostic testing around this time. R. 589–97. The examining doctor noted that Plaintiff was "[d]oing well" and would continue taking Tamoxifen. R. 597. The physician also noted that Plaintiff was experiencing "[b]ack pain" that was "[n]ot getting better." R. 597.

> b.   Musculoskeletal Complaints

In December 1999 and June 2003, respectively, Plaintiff underwent surgery to repair her right and left rotator cuffs. R. 421–34.

On May 20, 2009, Plaintiff saw Dr. Hoolihan regarding complaints of pain and numbness in her back and leg. R. 303–04, 344–45 (duplicate). Dr. Hoolihan noted that Plaintiff's neck was "supple," that she had "no edema" in her extremities, and Plaintiff had "normal strength, tone, and reflexes" with "limited [range of motion in her back] secondary to pain." R. 304. Dr. Hoolihan further noted "lumbar tenderness, bilateral, paraspinal muscles" and reported that the straight leg raising test was negative. R. 304. Dr. Hoolihan assessed "[l]ow back pain" and

---

[8] The Court notes that Plaintiff's medical records dated March 18, 2011 and thereafter were obtained by Plaintiff following her administrative hearing and were provided by Plaintiff's counsel to the Appeals Council for its review on February 14, 2012. R. 576–97.

prescribed two medications—Celebrex and Opana—and referred Plaintiff for a CT-scan.[9]  R.

304.

On May 26, 2009, Plaintiff underwent a CT-scan of the lumbar spine which showed

"right lateral disk protrusion at L4-L5 with mild central canal and right neural foraminal

stenosis," possible impingement of the "exiting nerve root on the right," and "broad-based disk

bulge at L3-L4 with mild to moderate central canal and bilateral neural foraminal stenosis."  R.

365–66 (typeface altered from original), 558–59.

On July 8, 2009, Plaintiff saw Dr. Richard Perkins at St. Francis Hospital's orthopedic

clinic regarding her complaints of leg pain.  R. 552.  Dr. Perkins noted that Plaintiff complained

of "pain shooting down" her right leg to her foot.  R. 552.  Plaintiff told Dr. Perkins that this pain

was "severe" and was "not relieved by narcotics."  R. 552.  Plaintiff's straight leg raising test was

negative at this time, and she had "good strength," but limited "lumbar" range of motion.  R. 552.

Dr. Perkins advised Plaintiff to seek emergency treatment if her symptoms worsened and referred

her for physical therapy.  R. 552.

On July 27, 2009, Plaintiff saw Dr. Sharma Mukta of Hudson River Healthcare /

Community Health regarding Plaintiff's complaint of shoulder pain.  R. 305–06, 338–39

(duplicate).  Plaintiff reported that her lower back pain was "[b]etter than before" and that her

"[l]eg pain and other leg symptoms [were] completely resolved."  R. 305.  Plaintiff also noted

that she had seen an orthopedic doctor who had recommended epidural injection and physical

therapy.  R. 305.  Plaintiff's current complaints included bilateral pain, with the pain being worse

_____

[9] Although, as the Commissioner notes, see Def.'s Mem. at 7 n.5, Dr. Hoolihan twice
updated Plaintiff's medical records upon the request of the SSA, Dr. Hoolihan did not provide an
opinion regarding Plaintiff's physical abilities or limitations.  R. 286–95, 323–33, 473–74.

7

on the left than on the right, and problems with "overhead abduction" of her right arm.  R. 305.

Dr. Mukta noted, with regard to Plaintiff's back, that she was "able to d [*sic*] all motions but are

limited" and, with regard to Plaintiff's lower extremities, that she had "no edema" and had "5/5"

motor strength bilaterally.  R. 305.  Dr. Mukta assessed back pain and shoulder pain, increased

Plaintiff's Opana prescription, which apparently improved Plaintiff's back pain but not her

shoulder pain, and discontinued her Celebrex prescription because Plaintiff apparently did not

respond to it.  R. 306.  Dr. Mukta noted that Plaintiff requested an X-ray of her left ankle and that

she also should have an X-ray of her shoulders bilaterally.  R. 306.  Dr. Mukta prescribed Tylenol

to address Plaintiff's shoulder pain and also referred Plaintiff back to the orthopedic clinic at St.

Francis Hospital.  R. 306.  X-rays of Plaintiff's left ankle taken on July 28, 2009 showed a

"fracture of the medial malleolus of uncertain age," "lateral soft tissue swelling," and

"hypertrophic changes of the lateral malleolus."  R. 174 (typeface altered from original), 364

(duplicate), 556–57.  X-rays taken of Plaintiff's shoulders on the same day showed

"postoperative and chronic changes" but "no acute osseous abnormality" in the right shoulder

and "chronic changes" but "no acute osseous abnormality" in the left shoulder.  R. 362–63

(typeface altered from original), 555–56.

Following Dr. Perkins's physical therapy referral, Plaintiff commenced physical therapy

at the Therapy Connection at St. Francis Hospital.  R. 553–54.  Although five sessions were

scheduled, Plaintiff apparently attended only three sessions, did not return after August 6, 2009,

and was discharged from the Therapy Connection as of October 12, 2009.  R. 554.

Plaintiff consulted with Dr. Farag Aboelsaad at Albany Medical Center on August 21,

2009 regarding her complaints of "chronic back pain."  R. 544–45.  Dr. Aboelsaad noted that

8

Plaintiff's "chief complaint" was "[l]ow back pain with right lower extremity pain." R. 544 (typeface altered from original). Plaintiff described her pain to Dr. Aboelsaad as "constant stabbing pain" and as "7-9/10 in numeric scale." R. 544. She noted that the pain went "down to the lateral thigh, posterior calf, posterior thigh and down to the top of the foot." R. 544. According to Plaintiff, this pain was "associated with . . . occasional numbness in the right lower extremity" and "increase[d] with walking, sitting" but "decrease[d] with sitting and legs up." R. 544. Regarding his physical examination of Plaintiff, Dr. Aboelsaad noted that Plaintiff sat "with no apparent distress or discomfort" and "walk[ed] with normal gait." R. 545. He described her motor strength as "5/5" and noted that the straight leg raising test was positive on the "right lower extremity." R. 545. With regard to Plaintiff's back, Dr. Aboelsaad noted "[t]enderness, paraspinal area, range of motion was diminished in all planes." R. 545. He assessed "chronic low back pain radiating to right lower extremity secondary to lumbar degenerative disk disease with radiculopathy," noted that he would schedule her for "right L4-L5 transforaminal epidural injection," and would "see her for followup after the injection." R. 545. On August 31, 2009, Plaintiff underwent a right-sided L4-L5 epidural injection at Albany Medical Center. R. 542–43.

On August 26, 2009, Plaintiff again saw Dr. Perkins at the orthopedic clinic at St. Francis Hospital regarding her complaints of shoulder pain. R. 551. Dr. Perkins assessed left shoulder impingement and recommended physical therapy and injection. R. 551. As discussed above, Plaintiff did not return for physical therapy at the Therapy Connection after August 6, 2009.

On November 11, 2009, Plaintiff returned to the orthopedic clinic at St. Francis Hospital regarding her left shoulder impingement. R. 550. Plaintiff reported that she had attended

physical therapy but had not completed the course of treatment and complained of back and ankle pain. R. 550.  Plaintiff reported that, while her shoulder pain had improved following an injection in August, she was experiencing a recurrence of pain.  R. 550.  The doctor assessed bilateral shoulder impingement and prescribed a bilateral shoulder injection.[10]  R. 550.

X-rays of Plaintiff's thoracic spine taken on January 5, 2010 showed "mild degenerative changes" and "no acute osseous abnormality."  R. 457 (typeface altered from original), 528.

On January 13, 2010, Plaintiff visited Dr. Mukta regarding her back and arm pain.  R. 491–92.  Plaintiff reported that the "muscle relaxer [was] helping with the leg pain," that her "[b]ack pain [was] better," that she had "injections in left shoulder," and that "pain in shoulder [was] better."  R. 491.  Following his examination of Plaintiff, Dr. Mukta noted that Plaintiff's neck was "supple," that she had "no edema" in her extremities, and that her motor strength was "5/5" in her upper extremities though Plaintiff reported "decreased touch sensation in left palm."  R. 491.  Dr. Mukta assessed numbness and osteoporosis, prescribed Flexeril for the numbness, ordered a DEXA scan for the osteoporosis, and referred Plaintiff to Westchester Medical Center ("WMC") for the numbness.  R. 491.  On January 21, 2010, the DEXA scan showed "normal bone marrow density of the lumbar spine and left hip."  R. 529–30 (typeface altered from original).

On January 25, 2010, following Dr. Mukta's referral, Plaintiff visited the neurology clinic at WMC.  R. 561, 566–69.  The neurologist ordered an MRI and EMG and advised Plaintiff to continue taking Neurontin.  R. 569.  On February 11, 2010, an MRI of Plaintiff's cervical spine

---

[10] According to the Commissioner, Plaintiff received this injection on November 11, 2009, see Def.'s Mem. at 9, though this is not clear to the Court from this handwritten record, R. 550.

showed "no evidence of . . . metastatic disease" and "mild stenosis" due to "degenerate disk disease." R. 415–16 (typeface altered from original), 537–38 (duplicate). An MRI of Plaintiff's lumbar spine taken on the same day showed "no evidence of metastatic disease," "dextroscoliosis," and "mild stenosis" due to "disk bulges." R. 417–18 (typeface altered from original), 535–36 (duplicate). An MRI of Plaintiff's thoracic spine taken on the same day showed "no evidence of osseous metastasis," "right neural foraminal perineural/arachnoid cyst," "mild multilevel spondylosis," and "no degenerative disk disease or stenosis." R. 420 (typeface altered from original), 533–34 (duplicate).

On February 19, 2010, Plaintiff returned to Dr. Mukta. R. 516–17. Dr. Mukta noted that Plaintiff had seen a neurologist, that the neurologist had ordered an MRI of her back, and that Plaintiff was to follow up with the neurologist. R. 516. Dr. Mukta's examination indicated that Plaintiff's neck was "supple" and that she had "no edema" in her extremities. R. 516.

On March 22, 2010, Plaintiff returned to WMC's neurology clinic regarding her complaint of low back pain. R. 564–65. The neurologist advised Plaintiff to continue Neurontin and Flexeril and to start taking Elavil. R. 565.

On March 25, 2010, Plaintiff followed up with Dr. Mukta. R. 509–11. During this visit, Plaintiff reported that she recently had seen a neurologist and planned to schedule injections for her back. R. 509. Dr. Mukta's examination showed that Plaintiff's neck was "supple," that she had "no edema" in her extremities, that she had "5/5" motor strength in her lower extremities, that her "sensation [was] intact" bilaterally, and that she had a positive straight leg raising test on the left side. R. 509. Dr. Mukta assessed spinal stenosis and noted that Plaintiff should continue Neurontin, Elavil, Flexeril, and Naproxen. R. 509.

11

On July 1, 2010, Plaintiff visited Dr. Christopher George of Hudson River Healthcare / Community Health primarily regarding complaints of a cough, but also reported that her "chronic neck and back pain [had] not improved with cortisone injection." R. 486–87. Based on his examination of Plaintiff, Dr. George noted that Plaintiff's neck was "supple" and that, from a musculoskeletal standpoint, Plaintiff had a "full range of motion" with "no joint tenderness or swelling." R. 487.

On July 12, 2010, Plaintiff returned to WMC's neurology clinic regarding her complaints of back and arm pain. R. 562–63. The neurologist's exam indicated "5/5" motor strength "throughout" and normal gait. R. 562. Plaintiff was advised to continue with Neurontin and Flexeril and increase Elavil. R. 563.

On October 15, 2010, Dr. George saw Plaintiff regarding her complaints of back pain. R. 476–78. Plaintiff reported that she had been experiencing back pain for a year and a half and that her prescription medications and epidural injections had not improved her symptoms. R. 476. Plaintiff noted that she experienced "pain with increased activity." R. 476. Dr. George's examination of Plaintiff showed that Plaintiff's neck was "supple," that there was "no evidence of scoliosis" in Plaintiff's back, that Plaintiff had normal gait, and that Plaintiff had "no joint tenderness or swelling." R. 477. With regard to Plaintiff's cervical spine and neck, Dr. George noted that "[m]yofascial trigger points are present" and that Plaintiff had a normal range of motion in all directions in her neck. R. 477. With regard to Plaintiff's lumbar spine and lower back, Dr. George reported that Plaintiff had "normal sacroiliac joint mobility bilaterally," "limited range of motion in all directions," "paraspinal tenderness," "SI joint tenderness," a positive straight leg raising test at forty-five degrees, "normal bilateral lower extremities," and

12

normal gait. R. 477. Dr. George assessed spinal stenosis, prescribed Gabapentin, and

recommended that Plaintiff continue Flexeril. R. 477. Dr. George also referred Plaintiff to Dr.

Neal Dunkelman for pain management. R. 477.

On October 25, 2010, following Dr. George's referral, Plaintiff visited Dr. Dunkelman

regarding her complaints of neck and back pain. R. 546–49. According to Dr. Dunkelman,

Plaintiff reported having had "back pain for approximately one year" and "neck pain for

approximately three months." R. 546. Dr. Dunkelman noted that Plaintiff informed him that she

had done physical therapy from August 2009 until January 2010 and had "tried epidural steroid

injections in the past without significant relief." R. 546 (typeface altered from original).

Plaintiff reported that she also had received "Cortisone injections in both shoulders." R. 546.

Dr. Dunkelman stated that Plaintiff's "present complaint" was "continued low back pain," "pain

in the right leg with occasional numbness," and "neck pain." R. 546. Plaintiff had "no upper

extremity radicular type complaints." R. 546. Regarding his examination of Plaintiff, Dr.

Dunkelman noted that the exam "was pertinent for cervical and lumbar tenderness and spasm,"

that Plaintiff's "[r]ange of motion [was] mildly restricted for the cervical and lumbar spine," that

her "[d]eep tendon reflexes [were] symmetrical," that she had "[n]ormal tone" and "[n]o

atrophy," that she had "[n]o focal, sensory or motor deficits," that the straight leg raising test was

negative, and that her "[s]houlder abduction bilaterally [went] to 90 degrees." R. 547. Dr.

Dunkelman assessed "[c]ervical degenerative disc disease" and "[l]umbosacral radiculopathy."

R. 547. Dr. Dunkelman advised Plaintiff to continue taking Neurontin and Elavil and to try to

discontinue Flexeril. R. 547. Dr. Dunkelman noted that Plaintiff "was given a right paralumbar

trigger point injection today using 1% Lidocaine and Kenelog." R. 547. Dr. Dunkelman

13

instructed Plaintiff to follow up in one month.  R. 547.

On July 25, 2011, Plaintiff returned to WMC's neurology clinic regarding her complaints of back pain, arm pain, and numbness in her fingers.  R. 577, 582.  The doctor reported that Plaintiff had "5/5" motor strength in her right upper extremity and bilaterally in her lower extremities and "4+/5" motor strength in her left upper extremity.  R. 577.  The neurologist advised Plaintiff to continue Neurontin and increase Elavil.  R. 577.  The doctor noted that physical or occupational therapy was "not convenient" for Plaintiff.  R. 577.

On November 28, 2011, Plaintiff was seen for an evaluation of bilateral numbness and tingling in her upper extremities.  R. 578.  Plaintiff reported that she was in "constant" pain and was taking medication but experiencing "no significant relief."  R. 578.  While Plaintiff apparently experienced pain on neck extension, she had full and painless range of motion bilaterally in her shoulders and elbows.  R. 578.  The examining doctor ordered an MRI and requested Plaintiff's previous EMG results.  R. 578.  An MRI of Plaintiff's cervical spine performed on December 12, 2011 showed "C3-C4 bilateral neuroforaminal narrowing . . . with mild central disc/ridge complex seen at these levels" and "C5-6 moderate size right lateral disc/ridge complex which causes indentation upon the right cervical cord at this level and right sided C5-6 neuroforaminal narrowing."  R. 579, 585 (duplicate).

2.    *Consultative Examinations*

a.    Psychiatric Examination[11]

On October 15, 2009, Dr. Annette Payne conducted a psychiatric evaluation of Plaintiff.

_____

[11] While Plaintiff did not receive any psychological treatment, the SSA apparently arranged for this consultative examination, as well as state agency expert review, in light of Plaintiff's reference to depression in her application for benefits, R. 136, and the depression screenings conducted by Dr. Hoolihan, R. 297, 299.

14

R. 374–78.  According to Dr. Payne's report, Plaintiff "report[ed] [that] she ha[d] a high school diploma."  R. 374.  In addition to a summary of her physical symptoms and medical history, Plaintiff reported to Dr. Payne that she experienced trouble sleeping and had been "more depress[ed] recently because of her chronic back pain" and breast cancer.  R. 375. Plaintiff also reported that "she is capable of her own self-care," "is able to do her chores around the house" with "frequent breaks and rest," does "some cooking and cleaning," does "some laundry and shopping," "drive[s]," "spends her days mostly at home," works "on the computer," and "tries to work on her real estate projects."  R. 376–77.  Based on her evaluation of Plaintiff, Dr. Payne opined that Plaintiff "would have mild difficulties following and understanding simple directions and instructions" and with "performing simple tasks."  R. 377.  Dr. Payne further concluded that Plaintiff "has mild to moderate difficulties maintaining attention and concentration," "mild difficulties maintaining a regular schedule," "mild difficulties learning new tasks," "mild difficulties performing complex tasks," "mild to moderate difficulties making appropriate decisions," "mild difficulties relating with others," and "mild difficulties responding to changes in the environment."  R. 377.  Dr. Payne noted that Plaintiff's "reports appear consistent with her presentation."  R. 377.  Dr. Payne diagnosed "[c]hronic pain disorder associated both with psychological and her general medical condition" and "[d]ysthymic disorder."  R. 377.  Dr. Payne stated that Plaintiff "would benefit from counseling and psychotropic medications" and "would probably benefit from vocational rehabilitation."  R. 378.

          b.      <u>Orthopedic Examination</u>

     Dr. Suraj Malhorta performed an orthopedic examination of Plaintiff on October 15, 2009.  R. 379–82.  Plaintiff reported to Dr. Malhorta that she had "right shoulder pain for ten

years" but that it was "less now after she had injection in the left shoulder." R. 379. She described this pain as "intermittent" and as a "dull ache, 3/10 in intensity, [and] worse on stretching the arm." R. 379. She reported that she had "left shoulder pain for six years" and that this pain also was "intermittent, 3/10 in intensity, [and] worse on stretching the arm." R. 379.

Plaintiff further reported to Dr. Malhorta that she had experienced "persistent" pain in her lower back for six months. R. 379. She described this pain as "like a spasm, throbbing, 6/10 in intensity, worse on prolonged sitting and bending" and noted that this pain "radiate[d]" to her right leg and caused "numbness and tingling in the right lower extremity." R. 379.

Plaintiff also complained that she had experienced pain in her left ankle for twenty years and had fractured her left ankle several times. R. 379. She described this pain as "intermittent," "4/10 in intensity," and "worse on prolonged standing and walking." R. 379.

Plaintiff described her medical and treatment history for Dr. Malhorta and noted that her current medications included Tamoxifen and Opana. R. 379–80. She also noted that she had received an injection six weeks earlier that had improved her left shoulder pain. R. 379. Plaintiff also described her daily activities to Dr. Malhorta and noted that she cooked daily, did "not do a lot of cleaning," did laundry once per week, did shopping once per week, showered herself daily, dressed herself daily, watched television, listened to the radio, and read. R. 380.

Based on his observation and examination of Plaintiff, Dr. Malhorta noted that Plaintiff "appeared to be in no acute distress;" had normal gait; could not walk on her toes on the left due to ankle pain but could "squat three-fourths of the distance limited by back pain;" had normal station; did not use an assistive device; required no assistance changing for the exam or getting on and off the exam table; and was able to rise from a chair "without difficulty." R. 381. Dr.

16

Malhorta indicated that Plaintiff's "[h]and and finger dexterity [was] intact" and that her "[g]rip strength [was] 5/5 bilaterally." R. 381. Regarding Plaintiff's cervical spine, Dr. Malhorta noted that Plaintiff had "[f]ull flexion, extension, lateral flexion bilaterally, and rotary movements bilaterally" with "[n]o cervical or paracervical pain or spasm" and "[n]o trigger points." R. 381.

Dr. Malhorta reported that Plaintiff had "[s]ome limitation of the shoulder movements with forward flexion and abduction 90 degrees left side, 130 degrees right side, while adduction, internal and external rotation bilaterally are full range." R. 381. According to Dr. Malhorta, Plaintiff had full range of motion in her "elbows, forearms, wrists, and fingers bilaterally" as well as "[n]o joint inflammation, effusion, or instability." R. 381. Plaintiff showed "5/5" strength in her "proximal and distal muscles," "[n]o muscle atrophy," "[n]o sensory abnormality," and "[p]hysiologic and equal" reflexes in her upper extremities. R. 381.

Regarding Plaintiff's thoracic and lumbar spines, Dr. Malhorta noted "mild limitation of flexion/extension 80 degrees, lateral flexion 25 degrees right and left sides, and right and left side lateral rotation is 25 degrees each." R. 381. Plaintiff apparently showed "[n]o spinal or paraspinal tenderness," "[n]o SI joint or sciatic notch tenderness," "[n]o spasm," "[n]o scoliosis or kyphosis," "[n]o trigger points," and had a negative straight leg raising test. R. 381.

With regard to Plaintiff's lower extremities, Dr. Malhorta noted that Plaintiff had full range of motion in her "hips and knees bilaterally." R. 381. Dr. Malhorta reported "mild limitation" of Plaintiff's left ankle, "which is 15 degrees dorsiflexion" and that "[p]lantar flexion is full range," while Plaintiff had a "full range" of ankle movement on her right side. R. 381. According to Dr. Malhorta, Plaintiff had "5/5" strength in "proximal and distal muscles bilaterally," "[n]o muscle atrophy," "[n]o sensory abnormality," and "physiologic and equal"

17

reflexes in her lower extremities.  R. 381.  Dr. Malhorta noted "minimal swelling of the left ankle

laterally, with minimal tenderness in the lateral malleolus area."  R. 381.  Dr. Malhorta diagnosed

Plaintiff with (1) "[s]tatus post rotator cuff tear repair, both shoulders, remote, with pain;" (2)

"[l]umbosacral spine intervertebral disk disease, by history, with pain;" and (3) "[s]tatus post

fracture, left ankle, remote, with pain."  R. 382.  Dr. Malhorta opined that Plaintiff had (1)

"[m]inimal limitation in walking," (2) "[m]inimal limitation in bending," and (3) [m]ild

limitation in raising arms above shoulder level."  R. 382.

      3.     *State Agency Expert Opinions*

         a.     Psychological Expert

On December 11, 2009, state agency psychological expert Dr. R. Petro reviewed the

record and provided an opinion regarding the severity of Plaintiff's alleged mental impairment

and Plaintiff's residual functional capacity ("RFC") from a psychological standpoint.  R.

391–406.  Dr. Petro first concluded that Plaintiff did not have a severe mental impairment.  R.

391.  Dr. Petro further opined that Plaintiff had mild "restriction of activities of daily living,"

mild "difficulties in maintaining social functioning," mild "difficulties in maintaining

concentration, persistence or pace," and never had any "repeated episodes of deterioration each

of extended duration."  R. 401 (typeface altered from original).  Dr. Petro noted that Plaintiff

worked as many as twenty hours per week as a real estate agent "despite some depression and

chronic pain" and that she had the "ability to engage in day to day activities."  R. 403.

         b.     Medical Expert

On or about October 27, 2009, state agency medical expert Dr. C. Wakeley reviewed the

record and provided an opinion regarding Plaintiff's RFC from a medical standpoint.  R. 383–90.

Dr. Wakeley concluded that Plaintiff had "[n]o residual oncologic resrictions," had "acute exacerbations of back pain in the spring" but "[r]esponded well to treatment," "[h]ad previous ankle fractures and shoulder surgery," "ha[d] a normal gait and normnal [*sic*] neuro with no radicular findings," and "ha[d] limited [range of motion] of the left shoulder." R. 383. As for Plaintiff's RFC, Dr. Wakeley opined that Plaintiff could sit for up to six hours, stand and/or walk for up to six hours, frequently lift up to ten pounds, and occasionally lift up to twenty pounds. R. 383, 386, 389. Dr. Wakeley further concluded that any bending by Plaintiff or overhead reaching with her left arm should be limited to occasional. R. 383, 386, 389. While Dr. Wakeley acknowledged that Plaintiff "state[d] she ha[d] difficulty with lifting, walking, sitting, climbing stairs, and reaching with her left arm," he concluded that Plaintiff's "allegations [were] non-specific" and were only "partially credible based on available evidence in file." R. 388 (typeface altered from original).

## C.   <u>Plaintiff's Testimony at Administrative Hearing</u>

After Plaintiff's application was denied initially on December 11, 2009, Plaintiff requested a hearing before an administrative law judge ("ALJ"). R. 13, 62–63. This hearing was conducted on January 4, 2011 by video conference, and Plaintiff, who was represented by counsel at the hearing, testified regarding her alleged limitations. R. 13, 30–56. Specifically, Plaintiff testified that she continued to experience pain, particularly at night. R. 43–46, 48–50. She claimed that, at times, particularly in 2009, she had so much pain in her right leg that she could not stand. R. 48. Plaintiff represented that, while she could lift both arms overhead, she experienced some difficulty and pain in doing so, particularly with her right arm. R. 44. Plaintiff also stated that it was difficult for her to lift and estimated that she experienced pain when lifting

19

approximately five pounds.  R. 45–47.  She testified that, due to weakness, she did not walk

much and had trouble walking long distances in particular.  R. 49.  Plaintiff noted that, while she

recently had participated in a 5K walk for breast cancer, she used a cane while doing so and

experienced a great deal of pain during the walk.  R. 51.  She also stated that her ability to sit for

long periods was limited by pain.  R. 50.  Plaintiff discussed her course of treatment, including

prescription medications and injections.  R. 42–43, 45, 53–54.  In terms of daily activities,

Plaintiff reported that she spent most of her time at home, watching television, but did her own

grocery shopping and also went in to her real estate office once or twice a week for four to five

hours each, primarily to do computer-based work.  R. 50–53.

During the hearing, Plaintiff also admitted that she told the psychiatric consultative

examiner that she had a high school diploma, though she actually completed school only through

the tenth grade.  R. 35–38.  Plaintiff further stated that she had "gone through life saying [she]

had [a high school diploma], all [her] jobs, you know," although she then clarified that "[m]ost

people . . . . didn't ask."  R. 37–38.

**D.      Denial of Plaintiff's Claim by ALJ and Appeals Council; Plaintiff's Initiation of
          Action Seeking Federal District Court Review**

By decision dated March 31, 2011, the ALJ determined that Plaintiff was not disabled

within the meaning of the Act and denied Plaintiff's claim.  R. 10–24.  Specifically, the ALJ

found that, although Plaintiff had not engaged in substantial gainful activity since her alleged

onset date and had some severe impairments, none of her impairments—when considered either

individually or in combination—met or medically equaled one of the listed impairments set forth

in the Code of Federal Regulations.  R. 15–17.  The ALJ further determined that Plaintiff had a

20

RFC to perform light work[12]—with exceptions for only occasional overhead reaching, climbing, and crouching—and that, although she was unable to perform her past relevant work, there were jobs that existed in significant numbers in the national economy that she was able to perform. R. 17–23.

In reaching his decision, the ALJ considered the objective medical evidence set forth in the record, Plaintiff's subjective accounts of her symptoms, and the opinions offered by the consultative examiners and state agency medical experts. R. 17–22. The ALJ determined that the "objective medical findings reveal[ed] some physical limitations, but not to the extent alleged by" Plaintiff. R. 18. The ALJ gave "great weight" to the assessment provided by the orthopedic consultative examiner because it was "consistent with the objective medical findings." R. 20. The ALJ also afforded "significant weight" to the opinions expressed by the orthopedic consultative examiner and the state agency medical expert. R. 22.

The ALJ found, "[a]fter careful consideration of the evidence," that, while Plaintiff's "medically determinable impairments could reasonably be expected to cause the . . . symptoms" that Plaintiff described, Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the . . . residual functional capacity assessment." R. 18. The ALJ concluded that Plaintiff was "not fully credible" since she admitted that she had lied about having a high school diploma, which

---

[12]     Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. § 404.1567(b).

"undermine[d] her testimony concerning her reports of intensity, persistence and effects of pain"

because it was "clear [to the ALJ] that [Plaintiff] would be willing to exaggerate those reports in

order to support her claim for disability." R. 20. In reaching this conclusion regarding Plaintiff's

credibility, the ALJ also considered Plaintiff's daily activities; her course of treatment, including

medications and injections; the frequency and intensity of her symptoms; and alleged

exaggerations and inconsistencies between Plaintiff's statements and other evidence in the

record. R. 18–22. In conclusion, the ALJ noted that the "residual functional capacity assessment

[was] supported by the opinion of the [orthopedic] consultative examiner . . . ; the opinion of the

[state agency medical expert] . . . ; the medical evidence of record; and [Plaintiff's] testimony

which show [*sic*] a greater range of activities of daily living that [*sic*] someone who is completely

disabled." R. 22. As noted above, based on this RFC assessment, and also in consideration of

Plaintiff's age, education, and work experience, the ALJ concluded that there were jobs available

in significant numbers in the national economy that Plaintiff could perform and, therefore, that

Plaintiff was not disabled within the meaning of the Act. R. 22–23.

Plaintiff requested review of the ALJ's decision by the Appeals Council, but the Appeals

Council denied her request on May 2, 2012. R. 1–8. The ALJ's March 31, 2011 decision thus

became the final decision of the Commissioner and thereby is subject to review in this federal

court action, which was commenced by Plaintiff on June 29, 2012. Dkt. No. 1.

## III. DISCUSSION

**A.**   **Legal Standards**

1.   *Standard of Federal District Court Review*

Section 405(g) of Title 42 of the United States Code entitles a Social Security claimant to

seek judicial review of the Commissioner's final decision denying such a claimant's application for disability benefits.  District courts are empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  "It is not the function of a reviewing court to decide *de novo* whether a claimant was disabled." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999).  Rather, the court's review is limited to "'determin[ing] whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard.'"  Poupore v. Astrue, 566 F.3d 303, 305 (2d Cir. 2009) (quoting Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002)).

      2.     *Determination of Statutory Disability*

     To qualify for benefits under the Act, a claimant must demonstrate that she is disabled. The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A).  In addition, a claimant is eligible for disability benefits under the Act only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

     The SSA uses the following five-step analysis to evaluate disability claims:

     1.     The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2.   If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3.   If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations.  If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4.   If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5.   If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform.  The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000).  In determining whether a claimant is disabled, the Commissioner must consider "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983); see also 20 C.F.R. § 404.1529.  "'[S]tatements about [a claimant's] pain or other symptoms will not alone establish that [the claimant is] disabled.'"  Cruz v. Astrue, No. 06 Civ. 3670 (LTS)(DCF), 2009 WL 1024242, at *13 (S.D.N.Y. Apr. 9, 2009) (quoting 20 C.F.R. §§ 404.1529(a), 416.929(a)). "Where an ALJ makes a credibility assessment and decides to discount a claimant's subjective complaints of pain, the reviewing court must defer to that credibility assessment, as long as the ALJ's findings are supported by substantial evidence."  Id.

3.   *Substantial Evidence*

"In determining whether the agency's findings are supported by substantial evidence,

24

'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012) (quoting Mongeur, 722 F.2d at 1038). Substantial evidence is "'more than a mere scintilla'" and "'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 507 (2d Cir. 2009) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The substantial evidence standard is "even more" deferential than the "'clearly erroneous' standard." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012). The reviewing court must defer to the Commissioner's factual findings and the inferences drawn from those facts, and the Commissioner's findings of fact are considered conclusive if they are supported by substantial evidence. See 42 U.S.C. § 405(g); Shaw, 221 F.3d at 131. Accordingly, "once an ALJ finds facts," the reviewing court "can reject those facts 'only if a reasonable factfinder would *have to conclude otherwise*.'" Brault, 683 F.3d at 47 (quoting Warren v. Shalala, 29 F.3d 1287, 1290 (8th Cir. 1994)).

    4.    *Treating Physician Rule*

       In considering any medical opinions set forth in the administrative record, the ALJ should give the opinion of a claimant's treating physician "'controlling weight'" if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" Ocasio v. Colvin, No. 12-CV-6002 (JG), 2013 WL 1395846, at *9 (E.D.N.Y. Apr. 5, 2013) (quoting 20 C.F.R. § 404.1527(d)(2)). A "'treating source'" is a claimant's "'own physician, psychologist, or other acceptable medical source who provides [a claimant], or has provided [a claimant] with medical treatment or evaluations and who has, or has had, an ongoing treatment relationship with [a

25

claimant].'"[13] Id. at *9 n.26 (quoting 20 C.F.R. § 404.1502).

    5.    *Duty to Develop Record*

    Given the "non-adversarial nature" of the administrative proceedings, the ALJ "has an

obligation to develop the record . . . regardless of whether the claimant is represented by

counsel." Shaw, 221 F.3d at 131.  Because the "treating physician rule dovetails with the ALJ's

affirmative duty to develop the administrative record," the "duty of the ALJ is 'particularly

important when it comes to obtaining information from a claimant's treating physician.'"

Ocasio, 2013 WL 1395846, at *9 (quoting Devora v. Barnhart, 205 F. Supp. 2d 164, 172

(S.D.N.Y. 2002)).  Accordingly, the ALJ's obligation to develop the record "includes obtaining

the treating physicians' assessments of the claimant's RFC."  Id.  It is appropriate to "remand[]

to the Commissioner with directions to develop the administrative record further and to

reconsider" where necessary to ensure an accurate assessment of a claimant's entitlement to

benefits based on a fully developed record.  Burger v. Astrue, 282 F. App'x 883, 885 (2d Cir.

2008).

**B.    Analysis of Plaintiff's Claims**

    Plaintiff argues that (1) the ALJ failed to properly evaluate her credibility and improperly

discredited her subjective complaints when assessing disability, and (2) the ALJ's RFC finding

was not supported by substantial evidence.  See Pl.'s Mem. at 10–17 (unpaginated).  For these

reasons, Plaintiff argues that the case should be remanded so that the ALJ may further develop

_____

    [13] An "ongoing treatment relationship" exists where the claimant "see[s], or ha[s] seen,
the source with a frequency consistent with accepted medical practice for the type of treatment
and/or evaluation required for [the claimant's] medical condition(s)."  20 C.F.R. § 404.1502.
The SSA "may consider an acceptable medical source who has treated or evaluated [the
claimant] only a few times . . . to be [the claimant's] treating source if the nature and frequency
of the treatment or evaluation is typical for [the claimant's] condition(s)."  Id.

the record and properly consider Plaintiff's credibility.  See id. at 17.  The Commissioner, in

contrast, argues that the Court should affirm the Commissioner's decision because "it is legally

correct and supported by substantial evidence."  Def.'s Mem. at 18 (typeface altered from

original); see id. at 19–26.

      1.    *Plaintiff's Credibility*

     According to Plaintiff, the ALJ discredited all of Plaintiff's subjective complaints of pain

and other symptoms based on her having admitted that she lied about having completed high

school.  See Pl.'s Mem. at 12.  Plaintiff argues that this determination was not supported by

substantial evidence given that "none of the doctors who evaluated" Plaintiff "even intimate[d]

that she might be exaggerating."  Id. (typeface altered from original).  According to Plaintiff, her

"fabrication regarding the extent of her education is not 'substantial'" and "cannot be seen to

taint everything to which she either testifies or told the [SSA] or her treating sources."  Id. at 13.

Plaintiff further argues that the ALJ erred in failing to consider her significant prior work history

when making his credibility determination.  Id.  Finally, Plaintiff argues that the ALJ "selectively

cited from the record" and considered several of her statements out of context when determining

that they were inconsistent with other evidence in the record.  Id. at 13–14.  The Commissioner

argues that the "ALJ's credibility finding is supported by substantial evidence and reflects a

proper application of the controlling legal standards."  Def.'s Mem. at 23–24; see also id. at

24–25.

     "Where a claimant complains that he or she is limited by pain, the ALJ is required, first,

to determine whether the claimant suffers from a 'medically determinable impairment[] that

could reasonably be expected to produce' the pain alleged."  Barone v. Astrue, No. 09 Civ. 7397

(KBF)(DF), 2011 WL 7164421, at *13 (S.D.N.Y. Dec. 27, 2011) (quoting 20 C.F.R. §
404.1529(c)(1)) (Report & Recommendation), adopted by 2012 WL 382925 (S.D.N.Y. Feb. 6,
2012). If the ALJ concludes that the claimant has such an impairment, "then the ALJ must take
the second step of evaluating the intensity and persistence of the claimant's symptoms" by
"considering all of the available evidence." Id. "[W]here the ALJ finds that the medical
evidence does not substantiate the claimant's" subjective allegations regarding pain and other
limitations, "the ALJ must assess the claimant's credibility by considering seven factors
enumerated in the Social Security regulations." Rivera v. Astrue, No. 10 CV 4324 (RJD), 2012
WL 3614323, at *14 (E.D.N.Y. Aug. 21, 2012). These factors are: (1) the claimant's "daily
activities;" (2) the "location, duration, frequency, and intensity" of the claimant's "pain or other
symptoms; (3) "[p]recipitating and aggravating factors;" (4) the "type, dosage, effectiveness, and
side effects of any medication" the claimant "take[s] or ha[s] taken to alleviate [her] pain or other
symptoms;" (5) "[t]reatment, other than medication," the claimant "receive[s] or ha[s] received
for relief of [her] pain or other symptoms;" (6) "[a]ny measures" the claimant "use[s] or ha[s]
used to relieve [her] pain or other symptoms;" and (7) "[o]ther factors concerning [her]
functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. §
404.1529(c)(3)(i)–(vii); see also Baron v. Astrue, No.11 Civ. 4262 (JGK)(MHD), 2013 WL
1245455, at *28 (S.D.N.Y. Mar. 4, 2013) (Report & Recommendation), adopted by 2013 WL
1364138 (S.D.N.Y. Mar. 26, 2013). Additionally, as Plaintiff notes, the "Second Circuit has held
that a claimant with a good work record is entitled to 'substantial credibility' when claiming an
inability to work because of a disability." Romanelli v. Astrue, No. CV-11-4908 (DLI), 2013
WL 1232341, at *11 (E.D.N.Y. Mar. 26, 2013) (citing Rivera v. Schweiker, 717 F.2d 719, 725

28

(2d Cir. 1983)).

"The ALJ ultimately exercises broad discretion to 'arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant.'" Castellano v. Astrue, No. 07 Civ. 4608 (NRB), 2008 WL 2951925, at *7 (S.D.N.Y. July 30, 2008) (quoting Perez v. Barnhart, 234 F. Supp. 2d 336, 340–41 (S.D.N.Y. 2002)). Additionally, "[u]nder the substantial evidence standard, a credibility finding made by an ALJ is entitled to deference by a reviewing court." Acevedo v. Astrue, No. 11 Civ. 8853 (JMF)(JLC), 2012 WL 4377323, at *11 (S.D.N.Y. Sept. 4, 2012) (Report & Recommendation), adopted by 2012 WL 4376296 (S.D.N.Y. Sept. 24, 2012). Nevertheless, "[a]n ALJ who finds that a claimant is not credible must do so 'explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his determination is supported by substantial evidence.'" Rivera, 2012 WL 3614323, at *14 (quoting Taub v. Astrue, No. 10-CV-2526 (ARR), 2011 WL 6951228, at *8 (E.D.N.Y. Dec. 30, 2011)).

It is apparent to the Court that the ALJ employed the requisite two-step analysis and "followed the procedure for assessing the credibility of [Plaintiff's] subjective claims of pain with reasonable fidelity." Id.; see also R. 17–22. As discussed above, the ALJ first found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the . . . symptoms" that Plaintiff described. R. 18. The ALJ then found that the objective medical evidence did not fully support Plaintiff's subjective account of her symptoms and therefore assessed her credibility. R. 18–22. In reaching his conclusion that Plaintiff's account of her symptoms was not fully credible, the ALJ considered Plaintiff's daily activities; the location, frequency, and intensity of her symptoms, including inconsistent statements made by Plaintiff on

29

these issues; and her course of treatment, including pain medications, injections, and physical

therapy, in accordance with the standard and factors set forth in the Social Security regulations.

R. 20–22; 20 C.F.R. § 404.1529(c)(3).  The Court is satisfied that the ALJ's findings with regard

to those factors were supported by substantial evidence in the record.  Moreover, in addition to

his findings on the factors discussed above, the ALJ also relied on other evidence in the record in

assessing Plaintiff's credibility, including Plaintiff's admitted lie regarding her level of education

and inconsistencies between Plaintiff's statements about the frequency and extent of her

treatment and the objective medical evidence regarding the frequency and extent of her

treatment.  R. 20–21.  This evidence further supports the ALJ's decision that Plaintiff's

testimony regarding her symptoms was not fully credible.  See Morales v. Comm'r of Soc. Sec.,

No. 10 Civ. 8773 (BSJ)(KNF), 2012 WL 124554, at *19 (S.D.N.Y. Jan. 17, 2012) ("The ALJ

considered, as he was required to do, the entire record, as well as his own observation of

[plaintiff's] demeanor and behavior at the hearing when determining [his] credibility" and

"identified evidence in the record with which [plaintiff's] testimony was inconsistent.") (Report

& Recommendation), adopted by 2012 WL 4793868 (S.D.N.Y. Oct. 9, 2012).  Finally, while the

ALJ did not explicitly consider Plaintiff's prior work history in assessing her credibility, the

ALJ's failure to "specifically reference[]" this history "does not undermine the credibility

assessment, given the substantial evidence supporting the ALJ's determination."[14]  Wavercak v.

Astrue, 420 F. App'x 91, 94 (2d Cir. 2011).

---

[14] While Plaintiff also argues that the ALJ erred by citing selectively to the record and considering some of Plaintiff's statements out of context, see Pl.'s Mem. at 13–14, the Court is not persuaded by this argument because, even considering the statements referenced by Plaintiff in their full context, the Court nonetheless concludes that the ALJ's credibility determination is supported by substantial evidence.

Accordingly, I respectfully recommend that Plaintiff's claim need not be remanded for further administrative proceedings on this basis.

2.    *RFC Determination*

Plaintiff argues that the "medical evidence does not support the RFC found by the ALJ." Pl.'s Mem. at 14 (typeface altered from original).  Plaintiff notes that "[t]here are no RFC . . . [a]ssessments from [Plaintiff's] treating sources and thus the ALJ adopt[ed] the restrictions of the examining consultant . . . , together with the opinion of the Commissioners' [*sic*] reviewing consultant . . . to arrive at his RFC for light work." Id. at 15.  Plaintiff also notes that, because the consultative examination and state agency expert review were conducted in October 2009, none of Plaintiff's treatment records from after October 2009 were even considered by Dr. Malhorta or Dr. Wakeley.  See Pl.'s Mem. at 16.  The Commissioner, however, argues that the ALJ's RFC finding is valid because it was "supported by the consultative examination report and opinion from Dr. Malhorta that Plaintiff had a minimal limitation of her ability to walk and bend and raise her arms above shoulder level" and by "State agency medical expert Dr. Wakeley['s] conclu[sion] that Plaintiff was capable of light exertion."  Def.'s Mem. at 20.  According to the Commissioner, the ALJ's RFC determination is further "supported by the treatment record showing that Plaintiff recovered fully from left-side breast cancer, and overall minimal findings related to her musculoskeletal complaints."  Id. at 21.

As Plaintiff argues, and as the Commissioner acknowledges, the record contains no treating physician opinions regarding Plaintiff's physical abilities or limitations.  While the

Commissioner notes that the SSA sought such opinions from Dr. Hoolihan and Dr. Budnik,[15] R. 250–57, 286–95, 323–33, 473–74, there is no indication in the record that the SSA requested such opinions from any of the other doctors who examined Plaintiff regarding her musculoskeletal complaints, including Dr. Mukta, Dr. George, Dr. Perkins, or the doctors at the neurology clinic at WMC.[16]  While the ALJ obtained a medical source statement regarding Plaintiff's physical limitations from consultative examiner Dr. Malhorta and an RFC assessment from state agency expert Dr. Wakeley, the Court notes that these statements and opinions were provided in October 2009, before the SSA had obtained records regarding many of Plaintiff's appointments with the doctors listed above.  Moreover, the Second Circuit has "cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination."  Selian v. Astrue, 708 F.3d 409, 419 (2d Cir. 2013).

Because the treating physician rule "dovetails" with the ALJ's duty to develop the record, the ALJ should have requested an RFC assessment at least from Dr. Mukta, who treated Plaintiff on an ongoing basis.[17]  See Ocasio, 2013 WL 1395846, at *9 (concluding that, where medical

---

[15]  The record indicates that the SSA also requested an opinion regarding Plaintiff's physical limitations from PROS, where Plaintiff obtained radiation treatment for breast cancer. R. 238–41.

[16]  While the Court notes that Dr. Mukta and Dr. George apparently practiced in the same facility as Dr. Hoolihan, the record indicates that the SSA directed its requests for an opinion regarding Plaintiff's physical limitations only to Dr. Hoolihan.

[17]  The Court notes that "[d]octors who see a patient only once do not have a chance to develop an ongoing relationship with the patient, and therefore are not generally considered treating physicians."  Garcia v. Barnhart, No. 01 Civ. 8300 (GEL), 2003 WL 68040, at *5 n.4 (S.D.N.Y. Jan. 7, 2003).  Accordingly, it is not clear to the Court that the ALJ's duty to develop the record required him to seek RFC assessments from Dr. George or Dr. Perkins, who apparently each saw Plaintiff only twice, or from Dr. Aboelsaad or Dr. Dunkelman, who apparently each saw Plaintiff only once, and who therefore may not have had a sufficiently "ongoing treatment relationship" with Plaintiff to be considered "treating source[s]" under the

records supplied by plaintiff's treating physician consisted of "notes from an initial consultation,

an MRI, and two follow-up visits" but "fail[ed] to address [plaintiff's] functional abilities,"

"ALJ's obligation to ensure the full development of the record included obtaining [treating

physician's] assessment of [plaintiff's] functioning" and "[h]is failure to do so constitute[d] a

failure to fulfill his affirmative obligation to develop the record"); see also Aceto v. Comm'r of

Soc. Sec., No. 6:08-CV-169 (FJS), 2012 WL 5876640, at *16 (N.D.N.Y. Nov. 20, 2012) (finding

that, because "the ALJ had nothing more than treatment records and consultative reports to

review, he had an affirmative duty to develop the record and request that Plaintiff's treating

physicians assess her RFC"); Felder v. Astrue, No. 10-CV-5747 (DLI), 2012 WL 3993594, at

*11 (E.D.N.Y. Sept. 11, 2012) (noting that, while the "absence of an RFC statement from the

record does not necessarily make the record incomplete," the "Commissioner has an affirmative

duty to request RFC assessments from a plaintiff's treating sources despite what is otherwise a

complete medical history"); Mezzacappa v. Astrue, 749 F. Supp. 2d 192, 207 (S.D.N.Y. 2010)

(noting that, "even when the claimant is represented by counsel," ALJ is "'compel[led] . . . to

obtain from the treating source expert opinions as to the nature and severity of the claimed

disability'" and finding that, "[a]lthough the SSA twice attempted to contact [plaintiff's treating

physician] so that he could provide a residual functional capacity analysis of [plaintiff], that did

not absolve the ALJ of his responsibility to follow up with" treating physician) (quoting Oliveras

v. Astrue, 07 Civ. 2841 (RMB)(JCF), 2008 WL 2262618, at *6 (S.D.N.Y. May 30, 2008)

---

applicable regulation. 20 C.F.R. § 404.1502. The Court also notes that Plaintiff apparently
sought treatment at WMC's neurology clinic on four occasions and at the Therapy Connection at
St. Francis Hospital on three occasions, though it is not clear whether she developed an ongoing
treatment relationship with any particular physician or physicians at these facilities such that the
ALJ was required to request an RFC assessment from any doctor or doctors at those facilities.

(Report & Recommendation), <u>adopted by</u> 2008 WL 2540816 (S.D.N.Y. June 25, 2008)); <u>Kirton v. Astrue</u>, No. 06-CV-4080 (KMK)(PED), 2009 WL 2252092, at *7 (S.D.N.Y. July 28, 2009) (finding that "medical documentation included in the administrative record is insufficient to support the negative inference drawn by the ALJ because Plaintiff's doctors were not asked to, and did not, provide any assessment of Plaintiff's functional limitations" but rather "consist[ed] entirely of raw treatment records provided in response to form letters from SSA requesting 'all medical records'") (Report & Recommendation), <u>adopted by</u> 2009 WL 2252092.

Accordingly, I respectfully recommend that the Court remand for further administrative proceedings on this basis.

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, I respectfully recommend that Defendant's motion for judgment on the pleadings be **DENIED** and that Plaintiff's motion for judgment on the pleadings be **GRANTED** to the extent that the case be **REMANDED** for further administrative proceedings pursuant to 42 U.S.C. § 405(g), sentence four.

Dated: May 3, 2013
      White Plains, New York

                              Respectfully submitted,


                              _____
                              Paul E. Davison
                              United States Magistrate Judge


34

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to serve and file written objections.  See also Fed. R. Civ. P. 6(a), (b), (d). Such objections, if any, along with any responses to the objections, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of the Honorable Vincent L. Briccetti, at the Honorable Charles L. Brieant, Jr. Federal Building and United States Courthouse, 300 Quarropas Street, White Plains, New York 10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Briccetti.